IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

WILLIAM L. JOHNSON, )
)
       Plaintiff, )
)
vs. ) Case No. 12-3267-CV-S-ODS
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
       Defendant. )

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying his application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in July 1974. He has prior work experience as a driver, laborer, medical transporter, and inspector. He completed the eleventh grade, earned his GED, and – as will be discussed further below – has actively pursued an Associate's Degree and plans to pursue a Bachelor's Degree. Plaintiff filed his application for disability benefits under Title II in February 2007, alleging an onset date of February 28, 2006. His insured status expired December 31, 2009, so Plaintiff must have been disabled on or before that date to qualify for benefits.

### A. Medical History

Plaintiff was involved in a job-related accident on February 28, 2006, and he has not worked since that date. The accident injured Plaintiff's back, and he was initially

treated initially by Dr. Glenn Cooper.  Dr. Cooper initially diagnosed Plaintiff as suffering from low back pain secondary to a lumbar strain and grade I spondylolisthesis at L5-S1.  R. at 556.  On March 28, Dr. Cooper opined that "[T]he best course of action would be for this patient to be referred to a spine specialist in orthopedics and consider undergoing a spinal fusion at L5-S1. . . . [R]egardless of the patient's level of recovery would return the patient to work with permanent restrictions that would be rather severe.  With this type of anomaly at the lumbosacral region he would be placed on a lifting restriction as well as a forward bending and push/pull restriction."  R. at 560.  On April 11, Dr. Cooper concluded that conservative treatment had been unsuccessful and referred Plaintiff to an orthopedic surgeon.  R. at 556.

Plaintiff began seeing doctors at Springfield Neurological & Spine Institute.  He was administered a series of epidural injections, but they did not provide relief.  In August 2006, the worker compensation insurer arranged for Plaintiff to see Dr. Michael Chabot, who opined that Plaintiff's work injury exacerbated a preexisting back condition, efforts to resolve Plaintiff's pain had been both reasonable and ineffective, and that surgery was required.  Dr. Chabot also indicated Plaintiff eventually "could return to limited work duties with no lifting more than 55-60 pounds with limited squatting and bending" but predicted Plaintiff would not reach maximum improvement "for several months after surgical intervention."  R. at 614-17.  Dr. Chabot performed the surgery in early October 2006.  Dr. Chabot directed that he remain off work until December 13, at which time he advised Plaintiff could "return to light duty with no lifting more than 15 pounds for half-day."  While it is not clear as it could be, this statement appears to approve Plaintiff's return to work part-time.  During this same visit, Dr. Chabot advised Plaintiff to continue physical therapy and home exercises, which were to be "advanced to a work-conditioning program."  R. at 611.

On January 10, 2007, Dr. Chabot reported Plaintiff was "doing much better" and was able to move without difficulty and that the fusion appeared to be "complete."  He also noted Plaintiff's physical therapy reports demonstrated Plaintiff "made excellent progress with respect to improving strength and endurance."  The report is devoid of any serious complaints from Plaintiff, including complaints of pain.  Dr. Chabot "recommend[ed] that the patient return to limited work duties with no lifting more than

2

40-45 pounds [and] continue with work conditioning to maximize strength and endurance. R. at 610. A similarly positive report was made on January 24, at which time Dr. Chabot indicated Plaintiff could "return to limited work duties . . . with no lifting more than 60 pounds." He reserved a final opinion on Plaintiff's work restrictions pending the results of a Functional Capacity Evaluation. R. at 609. Based on that evaluation, on January 30 Dr. Chabot opined Plaintiff could lift in the 50-60 pound range. R. at 608. On February 12, Dr. Chabot assessed Plaintiff as suffering from permanent partial disability to 12% of the body as a whole. R. at 607. Nine days later Plaintiff filed this application for disability benefits.

Plaintiff began seeing Dr. James Thompson on May 14, 2007. Plaintiff reported experiencing back pain that radiated through his thighs and claimed the pain started seven to eight months prior (even though this would have been during the recuperative period from the surgery and Plaintiff never made any similar complaints to Dr. Chabot). Dr. Thompson's examination revealed decreased range of motion in the right hip and no limitation in the left hip, full range of motion in the neck, and no other objective findings. Plaintiff also reported feeling stressed and having difficulty concentrating. Dr. Thompson prescribed Lyrica (for the pain), amitriptyline (an antidepressant/anti-anxiety medication), and samples of Effexor (used to treat depression, anxiety, and panic disorders). R. at 851-53.

On May 30, Plaintiff saw Dr. Truett Swaim on a consulting basis, apparently in connection with his worker compensation claim. He told Dr. Swaim that he experienced "constant low back pain" that was "worsened by lifting, bending, twisting, prolonged standing, prolonged sitting, etc." Dr. Swaim opined that Plaintiff "will have ongoing back pain, lumbar radiculopathy, left sacroiliac joint dysfunction, lumbar muscle spasm with decreased [range] of motion, and left leg weakness" and had 50% permanent partial disability to the body as a whole. He further indicated Plaintiff could work but was limited to lifting or exerting force in the amount of ten pounds constantly, ten to twenty pounds frequently, and twenty to fifty pounds occasionally, and needed to avoid prolonged sitting, standing or walking. R. at 840-47.

Plaintiff returned to Dr. James Thompson on June 25 and reported the Lyrica and Effexor (he had "not started the amitriptyline yet") did not help with his pain, stress or

3

anxiety and described experiencing episodes that Dr. Thompson described as "true panic attacks." The medical exam produced similar results to those found in May, and Dr. Thompson also wrote "No spasm" – yet, in his diagnosis, he added back spasm to the previous diagnoses of back pain and stress. He prescribed Plaintiff Effexor for stress and Lorazepam for back spasms. R at 854-56. He also provided a medical statement to support Plaintiff's application for a disabled license placard, indicating Plaintiff could not walk more than fifty feet without needing to stop to rest "due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." R. at 924. To that date, Dr. Thompson's records had not reflected Plaintiff made such complaints. Plaintiff's next appointment was on August 9, and Dr. Thompson issued a report that was very similar to the ones he issued in the past in terms of Plaintiff's physical condition. The report states Plaintiff has "anxiety, feels of stress, difficulty concentrating and sleep disturbance" but was not depressed. However, Dr. Thompson's diagnosis was limited to "[l]ow back pain" and he prescribed Gabapentin and Ultram for pain and Cyclobenzaprine for muscle spasms. R. at 857-59.

On January 10, 2008, Plaintiff went to the Urgent Care Clinic complaining of back pain that had persisted for the preceding two days. Nothing neurologically or psychologically remarkable was noted. R. at 722-24. The next day Plaintiff saw Dr. James Thompson for the first time since August 2007. He continued to complain of constant low back pain radiating to his arms and thighs. He also complained of nausea and vomiting over the preceding two weeks. Dr. Thompson indicated Plaintiff was "[n]egative for depression, feelings of stress, personality change, difficulty concentrating, sleep disturbance and suicidal thoughts." In addition to assessing Plaintiff as suffering from low back pain and nausea, Dr. Thompson indicated – with a single word – that Plaintiff suffered from tremors. This diagnosis was made even though nothing else in the notes from this visit mentions any complaints or observations to support the diagnosis. R. at 919-21. Two weeks later, Dr. Thompson listed Plaintiff's "Current Problems" as including low back pain, stress, and tremor – even though Plaintiff made no reports about tremors and no tremors are documented anywhere else in the report. R. at 916-17.

4

In April, Dr. James Thompson noted Plaintiff complained of "mild back pain" that was "most prominent in the mid lumbar spine . . . radiat[ing] to the neck, shoulders and upper arms." The pain was constant and commenced one month prior. Dr. Thompson also wrote that while Plaintiff presented "suggestive symptoms" he did "not currently carry an official diagnosis of anxiety disorder." Dr. Thompson told Plaintiff to take Ibuprofen for his back and continue taking Lexapro for anxiety. R. at 910-12. In June Plaintiff went to the Urgent Care Clinic complaining of back pain that had been getting worse since the preceding Saturday; his range of motion was noted to be "ok." R. at 72-21.

Plaintiff had an MRI of his back in August 2008. The MRI showed a disc protrusion at C5-6 that was impinging on the spinal cord. Less-significant protrusions appeared at C6-7, T2-3, and T3-4. The latter three protrusions intruded upon the space near the spinal cord. R. at 731-32. He returned to Dr. Thompson after the MRI; Dr. Thompson's notes do not reflect that he was aware of the MRI, and his report is similar to those he issued in the past. R. at 901-03. Similar reports (that similarly fail to address the MRI) were issued following visits in October and December of 2008 and January 2009. R. at 893-900.

Plaintiff underwent a consultative psychological exam (performed by Dr. Stacy Bray) in November 2008. There is no indication that any diagnostic tests were administered. Based solely on Plaintiff's reports, the consultant concluded Plaintiff "presents with anxiety in social situations which affects his behavior and potentially his schoolwork. . . . This assessment alone is not adequate to provide a clear diagnosis; therefore, it is given provisional status." She assessed his current GAF score at 60-65, and his score in the past year at 60-70. R. at 954-57.

In April 2009, Dr. James Thompson completed a Medical Questionnaire. The form consists of two pages. In it, Dr. Thompson indicates Plaintiff can lift less than ten pounds occasionally, stand or walk for forty-five to sixty minutes at a time and four hours per day, sit for sixty minutes at a time and for four hours per day, is moderately limited in the use of his upper extremities, and would miss one to two days of work per month. R. at 932-33.

5

In May 2009, Plaintiff went to a different psychologist (Dr. Eva Wilson) for a psychological consultation. Diagnostic testing revealed Plaintiff scored in the above average range for intellectual and memory functioning, but he had "difficulty writing and with his designs, although [he] copied correctly, he was obviously tremorring when he wrote the designs." Plaintiff's results on the Minnesota Multiphasic Personality Inventory were invalid because he was "either exaggerating his mental problems, or crying for help." She opined Plaintiff suffered from bipolar disorder, post traumatic stress disorder, and that his prognosis was "good" but he required psychotherapy. R. at 935-38. Approximately two weeks later, Dr. Wilson completed a Medical Questionnaire. She checked boxes indicating Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions, carry out simple instructions, maintain attention and concentration for more than two hours, maintain regular attendance and perform within a schedule, complete a normal workday or work week without interruption from psychological symptoms, or ask simple questions or seek assistance. She also opined that Plaintiff would miss more than four days per month due to psychological conditions. When asked to provide clarifying comments, Dr. Wilson indicated the reader should refer to her prior report. R. at 940-43.

In June 2009, Dr. James Thompson wrote Plaintiff a note designed to help him obtain child care assistance from the State. The note simply states:

> Mr. Johnson has been incapacitated due to a back injury since 10/2006 until the present time. He does need child care due to the incapacity. I do not expect the back problem to resolve.

R. at 989. In July, Dr. Thompson referred Plaintiff to Dr. David Fontaine for evaluation of Plaintiff's depression. The appointment lasted thirty minutes, during which Plaintiff reported that he was going to school "to learn a profession where he does not have to provide muscle strength" and described his anxiety as "mak[ing] things difficult in social interactions," causing him to show up early to avoid being late, and making him reluctant to speak up in class. Dr. Fontaine concluded Plaintiff suffered from major depression, severe, with anxious features. He prescribed diazepam and Cymbalta and instructed Plaintiff to return five months. R. at 959-60.

6

Plaintiff began seeing Dr. Robert Shaw in November 2009. He denied that pain was the reason for his visit, but that he was applying for disability. Plaintiff reported chronic back pain, "tremor in hands for most of life" and bipolar disorder. Dr. Shaw assessed Plaintiff as suffering from familial tremor (even though he did not document any symptoms), chronic ulcer, chronic pain, hypertension, diabetes, and bipolar disorder. He prescribed metoprolol and refilled Plaintiff's prior prescriptions for tramadol (for pain). Plaintiff suggests metoprolol was prescribed for the tremors, Plaintiff's Suggestions in Support at 5, and Plaintiff certainly self-reported this fact, R. at 534, but Dr. Shaw did not say this is the purpose for the metoprolol. In addition, metoprolol is used to treat hypertension – another condition of Plaintiff's requiring treatment.[1] In February 2010, Dr. Shaw saw Plaintiff in connection with diabetes-related tests. In March, Plaintiff complained to Dr. Shaw that the tramadol was not helping with the back pain. The pain was radiating into Plaintiff's leg to his knee and kept him from standing for long periods of time. Tremors were not mentioned by either Plaintiff or Dr. Shaw, and Dr. Shaw described Plaintiff's back pain as "unchanged." R. at 1028-29. In April, Plaintiff told Dr. Shaw he had recently gone to the emergency room with severe pain in his neck and shoulder. Dr. Shaw noted Plaintiff had a limited range of motion in his neck and there was evidence of muscle spasms in the back. He prescribed Vicodin. R. at 1026-27. In May Plaintiff told Dr. Shaw he had begun seeing Dr. Richard Thompson (no apparent relation to Dr. James Thompson) for management of his pain. R. at 1025.

Earlier in May, Dr. Richard Thompson administered a steroid injection in Plaintiff's neck. He also described Plaintiff's back problem as a cervical disc disorder without spinal cord injury. R. at 1042-44. In June, Plaintiff described his back pain as aggravated by head movement and use of his arms and as alleviated with heat, stretching and medication. Dr. Thompson discussed administering a cervical epidural steroid injection to help address Plaintiff's back pain. R. at 1038-40. In July, Dr. Thompson apparently changed Plaintiff's medication and arranged for updated MRI and

---

[1]The Court takes judicial notice of this fact, which can be confirmed at multiple sources, including web sites operated by the Mayo Clinic, http://www.mayoclinic.com/health/drug-information/DR602483, and by the publisher of the Physician's Desk Reference. http://www.pdr.net/drug-summary/metoprolol-tartrate-and-hydrochlorothiazide?druglabelid=1402

7

x-ray.  R. at 1035-37.  The updated images were available to Dr. Thompson on August 4 because he references his review of them, but neither party points to their existence in the Record and the Court cannot locate them independently.  However, while Dr. Thompson confirms he reviewed them, he does not indicate what the images revealed.  R. at 1031-34.

## B.  Administrative Proceedings

An administrative hearing was held on February 4, 2009.  The ALJ issued an unfavorable decision in April 2009, but the Appeals Council reversed the decision.  A second hearing was held on April 12, 2010, and the ALJ issued another unfavorable decision in September 2010.  The second decision stands as the Commissioner's final decision, so that is the decision the Court will review.  However, the testimony from both hearings should be considered.

At the first hearing, Plaintiff testified he had returned to school in the Fall of 2007 to pursue an associate's degree.  He had completed enough hours (39) to be considered to be in his sophomore year.  He was maintaining a schedule of twelve credit hours per semester, which required him to go to school four days per week for one and a half to three hours per day.  R. at 84-85.  His grades were in the B and C range, and he did six hours of homework per week and spent an additional two hours per week on a computer for an online class.  Plaintiff took his own notes in class.  R. at 96-98.  He further testified that pain prevented him from performing manual labor and sitting for prolonged periods of time.  He could only sit for thirty minutes at a time and needed to shift every five minutes, but after a minute or two could sit down again.  He estimated he could stand for five minutes at a time (after which he would have to rest for ten minutes) and walk for one to two blocks (after which he would have to rest for up to one hour.  R. at 88-89, 99.  Plaintiff also reported experiencing tremors most of his life, but they had worsened following his back injury.  The combination of pain and tremors kept him from lifting very much weight.  He estimated he could lift and carry two to eight pounds.  R. at 88-91, 99. With respect to anxiety, Plaintiff testified the medication he was taking did not help, and he feared crowds to the point that he could not function: he

could not speak in front of the class, experienced six panic attacks per month and additionally felt like a panic attack was impending on a daily basis. R. at 91-93. In addition to going to school and doing homework, his daily activities consisted of waking his kids and getting them to school. He was able to dress, care for himself, prepare meals, clean the kitchen, and load the dishwasher on his own. He also spent three to four hours per day lying down and elevating his legs or using the Jacuzzi. R. at 94-95.

The vocational expert ("VE") at the first hearing was presented a series of hypothetical questions, some of which are described here. The first asked him to assume a person of Plaintiff's age, experience and education who could lift fifty pounds occasionally and twenty-five pounds frequently, stand and walk six hours per day, sit six hours per day, and had an unlimited ability to push and pull. The VE testified such a person could perform some of their prior jobs, including work as a truck driver and medical transporter. The second through fifth hypotheticals were based on Dr. Chabot's opinions over time regarding Plaintiff's capabilities. One of those questions incorporated Dr. Chabot's opinions around the time he released Plaintiff to return to work with a lifting restriction of fifty pounds and a disability rating of 12% permanent partial disability to the body as a whole. The VE answered this hypothetical by indicating Plaintiff could return to his past work as a truck driver or medical transporter. R. at 104-05.

The sixth hypothetical asked the VE to assume Plaintiff was limited to lifting ten pounds frequently, twenty pounds occasionally, standing and walking six hours a day, sitting six hours a day, and required the option to sit or stand at will. The VE testified such a person could not perform their past relevant work, but could work as a cashier or information clerk. The VE further stated that the jobs actually required very little lifting: the information clerk would involve "little" lifting, and the cashier job would require lifting eight to ten pounds maximum. R. at 106-07. The seventh hypothetical asked the VE to assume the person was limited to sedentary work; the VE testified such a person could not return to their past relevant work but could work as a document preparer and telephone clerk. The former job was described allowing a person to sit and stand, while the latter job might or might not. R. at 107-08.

9

At the second hearing, Plaintiff testified his pain had intensified in the fourteen months since the first hearing. He testified he had five bulging discs and had been diagnosed as suffering from central benign tremor. He no longer helped around the house and spent more time watching TV and reading. R. at 122-23. Walking exacerbated his pain, and he now walked with a limp. R. at 125, 128-29. He was still going to school three times a week and planned to graduate that year with an associate's degree. He planned to pursue a bachelor's degree "in construction management, and become like an overseer of like a housing complex, or, you know, something that requires no manual labor, maybe an insurance adjuster." R. at 124. He also testified that the tremors he suffered were worse, that he could no longer use a computer touch screen, had difficulty typing, and that the school provided him with a note taker. R. at 130. He still avoided crowds because he thought people were looking at and talking about him. He also claimed to have difficulty concentrating and experienced feelings of worthlessness. R. at 132.

The ALJ found Plaintiff regained the ability to perform medium, light, and sedentary work within twelve months of his alleged onset date, as he had the ability to lift, carry, push, and pull twenty-five pounds frequently and fifty pounds occasionally, stand or walk six hours per day, and sit for six hours per day. R. at 37. In reaching this conclusion the ALJ discounted the effects of Plaintiff's anxiety and depression, noting his claims were inconsistent with his grades in college, the sparse treatment he received, and inconsistencies within and between those who evaluated his mental condition. The ALJ also found Dr. James Thompson's opinions were inconsistent with his treating notes, and that Plaintiff's testimony was inconsistent with his reports to doctors, the course of treatment from doctors, and his daily activities.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A. Failure to Defer to Dr. James Thompson's Opinion

Plaintiff contends the ALJ erred in failing to defer to Dr. James Thompson's April 23, 2009, Medical Questionnaire (R. at 932-39). Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Anderson v. Astrue, 696 F.3d 790, 793-094 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010). There are a number of factors justifying the ALJ's decision not to defer to this opinion. First, it describes a degree of limitation greater than is contained in any other report Plaintiff made to Dr. James Thompson. Second, it describes a degree of limitation that is inconsistent with what Plaintiff reported to other treating doctors. Third, Dr. James Thompson was not the only treating doctor with opinions in this case. For instance, while neither completed a Medical Questionnaire or a Medical Source Statement, both Dr. Chabot and Dr. Richard Thompson also qualified as treating physicians – and they indicated a degree of limitation that was not as extensive as described by Dr. James Thompson. Fourth, Dr. James Thompson appears to have not conducted any diagnostic testing. At best, he simply recorded what Plaintiff stated –

11

and, as noted, even that point is in question given that Plaintiff did not describe limitations of the sort reflected in the Medical Questionnaire.

In this same argument Plaintiff contests the ALJ's failure to properly evaluate Dr. Wilson's opinion as expressed in her Medical Questionnaire. Dr. Wilson saw Plaintiff on one occasion, so she is not a treating physician entitled to deference. Moreover, her opinion is inconsistent with Dr. Bray's, and the ALJ was not legally compelled to accept one opinion over the other. The ALJ was entitled to discount Dr. Wilson's assessment based not only on the conflicting report from Dr. Bray, but also the inconsistencies between her Medical Questionnaire and (1) her own narrative report, (2) Plaintiff's statements to his treating doctors, and (3) Plaintiff's daily activities.

### B. Credibility Assessment and Determination of Residual Functional Capacity

In related arguments, Plaintiff contends the ALJ failed to properly evaluate his credibility and made improper medical judgments in ascertaining his residual functional capacity ("RFC"). These errors allegedly led to improper hypothetical questions. The Court disagrees.

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that he experiences. E.g., House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to

12

>    subjective complaints, including the claimant's prior work
>    record, and observations by third parties and treating and
>    examining physicians relating to such matters as:
>
>    1.  The claimant's daily activities;
>    2. the duration, frequency and intensity of the pain
>    3. precipitating and aggravating factors;
>    4. dosage, effectiveness and side effects of medication;
>    5. functional restrictions.
>
>    The adjudicator is not free to accept or reject the claimant's
>    subjective complaints solely on the basis of personal
>    observations.  Subjective complaints may be discounted if
>    there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.  While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite <u>Polaski</u>.  <u>Schultz v. Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007).

Plaintiff's arguments start from a common origin: that the ALJ misapprehended the facts.  Plaintiff essentially invites the Court to reweigh the evidence, but the standard of review requires this invitation be declined.  Even if the Court would have reached a different result had it independently considered the evidence (which may or may not be true in this case), the Court cannot reverse on this basis.  <u>E.g.</u>, <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011).  The ALJ is the factfinder, and the only question is whether there is substantial evidence to support those findings.  The Court concludes there is.  Plaintiff's statements to doctors and treatment history suggest limitations that are far less onerous than he described in his testimony.  Treating doctors treated Plaintiff rather conservatively, which belies the degree of pain he alleges.  Plaintiff's attendance in college is laudable, and while it may not satisfy the legal definition of "substantial gainful activity," that activity is inconsistent with the specific limitations Plaintiff alleges in this case.  This does not mean that the ALJ was obligated to reach the findings she did; all it means is that there is substantial evidence in the Record to support them.

Plaintiff faults the ALJ for not incorporating limitations based on tremors.  As noted earlier, the Record does not (as Plaintiff suggests) clearly indicate a diagnosis of

13

tremors. Moreover, Plaintiff does not allege tremors imposed any limitations on his abilities until sometime between the first hearing in February 2009 and the second hearing in April 2010 – so the Record does not clearly establish tremors imposed any limitations before his insured status expired in December 2009. The absence of documentation or medical support justified the ALJ's decision to conclude Plaintiff's tremors did not impose a limitation that needed to be incorporated in the RFC.

Similarly, the Record does not compel a finding that anxiety or depression imposed any limitations on Plaintiff's RFC. Plaintiff was able to attend class, earn good grades, and otherwise function. His testimony about the degree to which these conditions affected him varied widely from his statements to treating doctors and other professionals, and the ALJ was entitled to discount his testimony and conclude they imposed no real limitations.

While "a claimant's RFC is a medical question, . . . in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). It is simply not true that the RFC can be proved *only* with medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam). Evidence of Plaintiff's actual daily activities and the medical evidence that existed was sufficient to support the ALJ's determination about Plaintiff's capabilities.[2]

## III. CONCLUSION

Substantial evidence in the Record as a whole supports the Commissioner's final decision. Therefore, that decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: April 24, 2013    UNITED STATES DISTRICT COURT

---

[2]While it is not a determination the Court is empowered to make, the Court nonetheless notes that the Record amply demonstrates Plaintiff can perform sedentary work (and probably light work). His academic career provides a substantial basis for this conclusion.